FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

DEC 28 2009

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| YALE PRESTON, | |
| Plaintiff, | |
| vs. | Case No. 08-CV-239-J |
| MARATHON OIL CO., THOMAS SMITH, and JOHN DOES 1-10, | |
| Defendants. | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court as a result of motions for summary judgment filed by both Mr. Preston and Defendants. Specifically, Defendants filed four motions for summary judgment (Docket Nos. 32, 51, 61, and 65), and Mr. Preston filed one (Docket No. 57). For the reasons discussed below, the Court will grant several motions in whole or in part, but genuine issues of material fact remain to be resolved at trial.

### *JURISDICTION*

This case involves relief under the patent laws of the United States, and therefore presents a question of federal law. This Court has jurisdiction pursuant to 28 U.S.C. § 1338.

In addition, Mr. Preston alleges several causes of action under the state law of Wyoming.

This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

## *FACTS*

This case involves a baffle system for use in coal bed methane mining operations. In

February 2001, Mr. Preston signed an at-will employment agreement with Pennaco, a

company that had recently been acquired by, and become a wholly-owned subsidiary of,

Marathon Oil Co. Mr. Preston alleges that he then began work for Pennaco with the title

Pumper II on either February 28 or March 1, 2001. Marathon disputes this start date and

claims that he began working no sooner than March 30, 2001. In any event, on April 5,

2001, Mr. Preston signed a document entitled, "Marathon Oil Company and Subsidiaries

Employee Agreement." Paragraph four of that document states:

> **Previous Inventions and Writings**. Below is a list and brief
> description of all of EMPLOYEE's unpatented inventions and
> unpublished writings. MARATHON agrees that such
> inventions and writings are NOT Intellectual Property [defined
> earlier in the document] and are NOT the property of
> MARATHON hereunder. If no listing is made, EMPLOYEE
> has no such inventions or properties.

Beneath this paragraph is handwritten the following: "CH4 resonating manifold." Mr.

Preston was required to either sign this document or his employment would be terminated.

Beginning in the late summer or early fall of 2002, Mr. Preston approached various

2

Marathon colleagues about a system that could address a problem in the mining of coal bed methane. Specifically, he had in mind a device that would assist the separation of water and methane gas in a well bore. This separation is designed to prevent methane gas from entering the submersible pump used to drive the methane extraction process, which would "gas lock" the pump. The pump may decline in performance and require replacement sooner than it otherwise would. The system proposed by Mr. Preston involved a series of baffles placed within the well bore. He claims that this baffle system was an integral part of the CH4 resonating manifold and that he had this idea before beginning employment with Marathon. According to his deposition testimony, Mr. Preston had created an illustration of the manifold, but had not further developed the idea. In other words, he had not constructed a prototype or tested the manifold or any of its components.

Mr. Preston had a series of conversations with various Marathon employees. These conversations are not generally especially relevant to the issues addressed here—although they will be important at trial—other than to note that Mr. Preston used one of Marathon's computers and a CAD (computer-aided design) program, licensed for Marathon's use, to create a diagram of the baffle system. Mr. Preston was "on call" for Marathon at the time, which means that he was not expected to perform any work unless something happened that required his attention. He was only expected to be available. This occurred around

3

Christmas of 2002, and Mr. Preston's stated goal, according to his deposition testimony, was to get his baffle idea into a "professional-looking credible form" prior to review by other Marathon employees. One Marathon employee that is of particular importance is Thomas Smith, one of the named defendants. Mr. Smith is an engineer who worked for Marathon at the time of these events and whose principal office was in Denver, Colorado. Mr. Smith discussed the baffle system with Mr. Preston and performed engineering calculations to determine the appropriate size of apertures in the baffle plates.

Eventually, Marathon decided to install the baffle system on several coal bed methane wells. A third-party fabricator constructed the baffle plates. Marathon paid the invoice for these baffle plates in the amount of $3,157.50. There were a total of 40 baffle plates constructed, and the invoice for the baffle plates is dated April 2, 2003. Once the plates were constructed, Marathon consented to the installation of the baffle system on several coal bed methane wells. Mr. Preston knew of three installations, although he was not personally involved in all of them.

In or about April of 2003, Mr. Preston's employment with Marathon was terminated. Mr. Preston stated in his complaint that his employment was terminated upon his return to work after taking a company-approved vacation.

Throughout 2003, Marathon installed the baffle system in 11 wells, all of which were

4

in the Powder River basin in Wyoming. According to Marathon's interrogatories, the first baffle system was installed on January 31, 2003 and the last on June 18, 2003.[1] All were removed by May 16, 2006 because Marathon was not satisfied that the baffle system was accomplishing its intended purpose. Both the installations and removals occurred during regular maintenance of the wells.

After termination of his employment, Mr. Preston filed a patent application for the baffle assembly he had conceived of and discussed with Marathon employees. Specifically, he filed the application on June 5, 2003. The application was published on December 9, 2004 and approved on November 1, 2005. The patent number is 6,959,764, and the Court will refer to it as the '764 patent. In 2004, Marathon's attorney contacted Mr. Preston regarding a patent application it intended to file for the baffle system in subterranean wells. Marathon intended to list Mr. Preston and Mr. Smith as the inventors of the system, and claimed that the system was conceived and made while both men were employed by Marathon. Marathon took the position that Mr. Preston's employment agreement required him to assign any interest to Marathon. Some discussion ensued, but Mr. Preston refused to

---

[1]As noted above, the baffle invoice is dated April 2, 2003. The Court notes that there is no explanation provided for an invoice date more than two months after the date of first installation. The Court can only speculate that some or all the baffle plates were completed around January, 2003 but Marathon was not invoiced until April of that year.

cooperate with Marathon's attorneys, and Marathon filed a patent application on June 14, 2004. The patent was published on December 15, 2005 and issued under patent number 7,207,385. The Court will refer to this as the '385 patent. Mr. Preston filed this lawsuit on November 10, 2008. He alleges six causes of action: 1) patent infringement, 2) declaratory judgment that he is the sole inventor on the '385 patent, 3) unjust enrichment and *quantum meruit*, 4) conversion, 5) breach of implied contract and duty of good faith and fair dealing, and 6) misappropriation of trade secrets. Defendants' answer included several counterclaims and affirmative defenses, including that Mr. Smith was the sole inventor on the '385 patent, that the employment agreement required Mr. Preston to assign all interests in the '764 and '385 patents to Marathon, and that Marathon acquired a shop right to use the baffle system..

## *ANALYSIS*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *e.g.*, *Kerber v. Qwest Pension Plan*, 572 F.3d 1135, 1144 (10th Cir. 2009). The party moving for summary judgment initially bears the burden of demonstrating that there is no genuine issue of material fact. *Haynes v. Level 3 Comm., LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). If the movant does not bear the burden at trial, this *prima facie* showing may be made by

6

pointing out to the Court that there is a lack of evidence for an essential element of the non-movant's claim. *Id.* If the movant establishes the *prima facie* showing, the burden shifts to the non-moving party to produce evidence of specific facts from which a reasonable jury could find in its favor. *Id.* The Court must view all facts and make inferences from the evidence in the light most favorable to the non-moving party. *E.g.*, *Utah Animal Rights Coalition v. Salt Lake County*, 566 F.3d 1236, 1242 (10th Cir. 2009). The Court may consider only admissible evidence. *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998). *See also* Fed. R. Civ. P. 56(e)(1).

### Shop Right

Marathon's first defense is the shop right doctrine. The shop right doctrine is a common-law rule "entitling an employer to use without charge an invention patented by one or more of its employees without liability for infringement." *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576, 1580 (Fed. Cir. 1993). The Court of Appeals for the Federal Circuit has recognized that "not all courts agree as to the doctrinal basis for 'shop rights,' and, consequently, not all courts agree as to the particular set of circumstances necessary to create a 'shop right.'" *Id.* at 1580-81. Some courts view a shop right as a type of implied license in favor of the employer, while others see it as a form of equitable estoppel, that is, the employee is estopped from alleging patent infringement. *Id.* at 1581. In any case, it is

7

the Court's role, "driven by principles of equity and fairness," to evaluate whether Marathon

has a shop right. *Id.*

> [C]ourts often look to both the circumstances surrounding the
> development of the invention and the facts regarding the
> employee's activities respecting that invention, once developed,
> to determine whether it would be fair and equitable to allow an
> employee to preclude his employer from making use of that
> invention.   This is essentially the analysis that most courts
> undertake regardless of how they characterize "shop rights."
>
> In view of the foregoing, we believe that the proper
> methodology for determining whether an employer has acquired
> a "shop right" in a patented invention is to look to the totality of
> the circumstances on a case by case basis and determine whether
> the facts of a particular case demand, under principles of equity
> and fairness, a finding that a "shop right" exists.   In such an
> analysis, one should look to such factors as the circumstances
> surrounding the development of the patented invention and the
> inventor's activity respecting that invention, once developed, to
> determine whether equity and fairness demand that the employer
> be allowed to use that invention in his business.   A factually
> driven analysis such as this ensures that the principles of equity
> and fairness underlying the "shop rights" rule are considered.

*Id.* at 1581-82. The United States Supreme Court has described the shop right doctrine as

follows:

> [W]here a servant, during his hours of employment, working
> with his master's materials and appliances, conceives and
> perfects an invention for which he obtains a patent, he must
> accord his master a nonexclusive right to practice the invention.
> This is an application of equitable principles.   Since the servant

8

> uses his masters time, facilities and materials to attain a concrete
> result, the latter is in equity entitled to use that which embodies
> his own property and to duplicate it as often as he may find
> occasion to employ similar appliances in his business.

*United States v. Dubliner Condenser Corp.*, 289 U.S. 178, 188-89 (1933).

Mr. Preston relies heavily on his assertion that he conceived of the baffle system prior

to his employment with Marathon because it is an integral component of the CH4 resonating

manifold. He claims that the shop right doctrine does not apply because he did not conceive

of the invention during his employment. Since Marathon did not contribute, for example,

materials or equipment, to Mr. Preston's conception of the baffle system, he claims that

Marathon cannot acquire a shop right to use the system. He also contends that Marathon's

contribution was minimal. For example, he notes that while he produced the CAD drawings

of the baffle system, he was on call and would be paid the same no matter what his activities.

He also points out that the baffle systems were installed during regular maintenance of the

wells, so Marathon incurred no additional cost in the installation. Marathon contends that

Mr. Preston reduced his idea to practice during his employment with Marathon and that this

alone is sufficient to create a shop right.

The Court agrees with Marathon. The factors raised by Mr. Preston—the conception

prior to employment and the relatively minor amounts of money spent on the baffle

9

system—are only two in the overall surrounding circumstances. There are other relevant

facts, as well. It is undisputed that Mr. Preston had produced nothing more than an idea and,

at most, a sketch of the CH4 manifold. He had never built any parts, including the baffle

systems, and he had never tested his idea. At Marathon, he approached several people with

this idea for the baffle system. Marathon contributed resources to building and installing the

baffle system. These resources not only included some time spent by Mr. Preston while "on

the clock," but also the time of other Marathon employees who worked on this project. There

is also undisputed evidence that Mr. Smith contributed some expertise by performing

calculations related to the baffle plates.[2] Mr. Preston states that Marathon paid around $300

to construct 12 baffle plates some time prior to January 2003. The only documentary

evidence of baffle plate construction is an invoice showing that 40 baffle plates were

constructed. The baffle system was installed in three wells. It appears that at some point

Marathon commissioned construction of an additional 40 baffle plates, as illustrated by an

invoice dated April 2, 2003. It is not clear whether Mr. Preston was aware that these plates

were constructed, but the invoice does list Mr. Preston in both the "Bill To" and "Ship To"

areas. In any case, Mr. Preston has stated—and nothing controverts his statement—that he

_____

[2]The significance of these calculations are discussed in more detail below. It is
sufficient for the current issue to note that Mr. Smith's calculations represented resources
contributed by Marathon to testing the baffle system.

knew that the baffle system was installed in three wells, but was not aware that Marathon installed the system in eight others. All the systems were installed well before December 9, 2004—the publication date of the '764 patent. Mr. Preston did not request that the system be removed from all wells upon termination of his employment. Marathon did not believe the baffle system was effective, and eventually removed all 11, although it waited until each well required maintenance.

Under these facts, viewed in the light most favorable to Mr. Preston, Marathon acquired a shop right to the baffle system. Mr. Preston benefitted from testing the baffle system in Marathon's wells and from the fact that Marathon paid to construct the systems in the first place. Mr. Preston, not having any coal bed methane wells himself, was utterly dependant on Marathon for access to the testing wells. This is a significant contribution. It is undisputed that Marathon's resources were used, even if not to conceive of the system, to develop Mr. Preston's conception into reality. Moreover, Marathon undertook to support this effort without any certainty that it would ultimately result in improved performance. Mr. Preston, on the other hand, bore no risk of loss. Consequently, the Court finds that principles of equity and fairness require that Marathon be permitted to use the baffle system pursuant

11

to the shop right doctrine.[3]

Defendants contend that a decision in their favor on the shop right issue will dispose of counts claims 1, 3, 4, and 6 to the extent that those claims rely upon alleged unauthorized use of the baffle system. For example, paragraph 61 of the complaint alleges that "Marathon has and continues to make and/or use the invention claimed in Preston's '764 Patent." Complaint at 7. To the extent any of Preston's claims rely on Marathon's own internal use of the baffle system, the Court finds that summary judgment in Marathon's favor is appropriate.[4]

The Court also notes that Defendants have filed other motions for summary judgment intended to address the patent infringement issue. First, they have alleged that they did not infringe the '764 patent because that patent requires a series of baffle plates, two of which have an "eccentrically located aperture grouping" (*e.g.*, '764 Patent Claim 1), and that photos of the installed baffle system show that the second and third plates have only an eccentrically

---

[3]It does not appear that Marathon has used Mr. Preston's baffle system since removing the last one in 2006. The Court's ruling on this issue, however, relieves it of liability for causes of action that rely on Marathon's unauthorized use of the baffle system.

[4]The complaint also alleges that Marathon induced infringement of others. The Court's ruling on the shop right issue does not impact Mr. Preston's ability to pursue this theory.

located single aperture. Therefore, they claim, no infringement occurred. Second, Defendants claim that they did not, as a matter of law, infringe the '385 patent because Mr. Smith is one inventor—if not the sole inventor—of that device, and that he assigned his interest to Marathon. Much of Defendants' briefing on this issue concerns Mr. Smith's contribution to the '385 patent, that is, the issue of joint inventorship. Mr. Preston, of course, disputes both these assertions.

The Court will not address either of these issues in light of its shop right ruling. Both parties' briefing on these questions involve whether Marathon infringed on a patent owned by Mr. Preston. Even if the Court were to find in Mr. Preston's favor regarding how the patents should be interpreted and construed, Marathon would still not be liable for infringement due to its limited license to use the baffle system pursuant to the shop right doctrine. Moreover, there would remain genuine issues of material fact regarding inventorship of the '385 patent, as discussed more fully below.

### Preemption and Trade Secrets

Defendants filed a motion for summary judgment contending that several of Mr. Preston's state law causes of action are preempted by federal patent law. They also argue that his claim of trade secret is barred by the statute of limitations. Finally, they argue that Mr. Preston's trade secret claim is both abandoned and untimely. Central to Defendants'

13

preemption argument is the premise that counts 3 and 4 are based entirely on the same conduct that constitutes alleged patent infringement in count 1. To the extent that state law offers "patent-like" protection, that law is preempted by federal law. *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377-78 (Fed. Cir. 2005). Defendants contend that counts 3 and 4 are therefore preempted.[5]

The Court largely need not decide the question of whether these state law causes of action are preempted because, to the extent they rely on Marathon's allegedly improper use of the baffle system, those counts are resolved by the Court's ruling on the shop right issue. In other words, Mr. Preston could not recover under any law, regardless of the nature of the claim, for Marathon's use of the baffle system because it had a shop right to use the system. To the extent that counts 3 and 4 are based on Marathon's use of the baffle system, Defendants are entitled to summary judgment in their favor.

The Court notes, however, that it appears there may be other bases for these claims. For example, Mr. Preston claims in claim 4 (conversion) that "Marathon exercised dominion over the subject intellectual property in a manner which denied Preston his right to use and enjoy such property and to exclude others from using such property." Complaint ¶ 113. The complaint does not specify how Marathon allegedly exercised this control, but it appears that

---

[5]Count 3 is unjust enrichment and quantum meruit. Count 4 is conversion.

14

the only act that might fit this description is Marathon's filing of the '385 patent.

It is the ruling of the Court that state law causes of action that relate to Marathon's conduct in filing the application for the '385 patent are barred as untimely pursuant to the relevant statute of limitations. Wyoming law provides a general four-year limitation period for "injury to the rights of the plaintiff, not arising on contract and not herein enumerated." Wyo. Stat. Ann. § 1-3-105(a)(iv)(C). Counts 3, 4, and 6—unjust enrichment/quantum meruit, conversion, and misappropriation of trade secrets, respectively—fall within this provision. Wyoming is a "discovery state," which means that the limitation period begins to run when a plaintiff knows or has reason to know that a cause of action exists. *E.g.*, *Amoco Prod. Co. v. EM Nominee P'ship*, 2 P.3d 534, 542 (Wyo. 2000). Mr. Preston filed this action on November 10, 2008. The operative question, then, is whether he knew or had reason to know that a cause of action existed prior to November 10, 2004.

The undisputed evidence demonstrates that Mr. Preston was well aware that Marathon was about to and in fact had filed an application for what would eventually become the '385 patent prior to November 10, 2004. The record contains several letters that, when read together, demonstrate Mr. Preston's knowledge. The first is a letter dated June 7, 2004 from Marathon's patent attorney, Mr. Jack Ebel to Mr. Preston. Preston Dep Ex. 7. The letter states that Marathon intended to file a patent application for the baffle system with Messrs.

15

Smith and Preston as co-inventors. *Id.* The letter notes that the application itself was enclosed. *Id.* Mr. Preston acknowledges receiving the letter and testified in a deposition that he did not respond to it. Preston Dep. 114-15.[6]

On November 3, Mr. Ebel sent Mr. Preston a letter stating that "[a] patent application that pertains to the use of baffles in subterranean gas wells has been prepared and filed." Dep. Ex. 15. The letter again stated Marathon's position that Mr. Preston was obligated to assign his interest in the earlier ('764) patent to Marathon. *Id.* This letter was sent via certified mail, and the certification indicates that the letter was personally received by Mr. Preston on November 8, 2004. *Id.*

The last letter that is relevant for discussion is one from Mr. Preston to Mr. Ebel, dated November 12, 2004. Dep. Ex. 16. In general terms, the letter is a general objection to Marathon having filed a patent application, listing Mr. Smith as a co-inventor, and

---

[6]The record also contains a letter dated June 10, 2004 from Mr. Ebel to Mr. Jack Pate, who Mr. Ebel believed to represent Mr. Preston. Dep. Ex. 11. In general terms, the letter covers similar ground as the June 7 letter, but states in addition that Mr. Ebel became aware that Mr. Preston may have filed a patent application on the baffle system and claims that the application is improper as it does not list Mr. Smith as co-inventor. Both letters also assert that Mr. Preston was required to convey his interest in any patents issued pursuant to his Marathon employment agreement. *Id.* It is not clear from the record whether Mr. Pate actually represented Mr. Preston at this time, or whether Mr. Preston ever received this letter. Accordingly, viewing the evidence in a light most favorable to Mr. Preston, the Court must proceed under the assumption that Mr. Preston never received this letter. This does not affect the Court's analysis.

16

asserting that Mr. Preston was obligated to assign his interest to Marathon. For example, the

paragraph regarding Mr. Smith states:

> Why is Thomas Smith a co-inventor? He clearly had nothing to
> do with my invention or my patent application for what you
> have labeled as the "Gas Baffle Invention." What does Thomas
> Smith feel he co-invented and when did he co-invent it?
> Furthermore, who disclosed this invention to you so that you
> could prepare a patent application and when was this disclosure
> made? When was this patent application filed with the USPTO?

*Id.* In addition, the letter explicitly acknowledges receiving the November 3 letter and "the

documents delivered to [Mr. Preston] on June 15, 2004." *Id.*

Lastly, the Court notes that Mr. Preston knew at some time during his employment

that there may be an issue regarding inventorship at some time near the end of his

employment. He stated in his deposition that he knew Mr. Smith told Mr. Preston that he

was claiming inventorship during his employment with Marathon, and chose not to act on

that knowledge. Preston Dep. 105.

Taken together, the letters and admissions of Mr. Preston firmly establish that he was

well aware prior to November 10, 2004 that Marathon was about to and did file the

application for what would eventually become the '385 patent. Mr. Preston knew that this

patent application covered the baffle system that he claims to have conceived, and he

believed this application was improper from the very beginning. The evidence indicates that

17

the cause of action almost certainly accrued on June 15, 2004, when Mr. Preston received the
'385 patent application materials. At the very latest, any state law causes of action based on
Marathon filing the patent application accrued on November 8, 2004, when he received the
letter from Mr. Ebel dated November 3, 2004. Accordingly, all state law claims based on the
filing of the application for the '385 patent are untimely and should be dismissed.

In summary, the Court finds that Defendants are entitled to summary judgment as to
the majority of Mr. Preston's claims. Regarding the claim of patent infringement and any
claims of improper use inherent in the remaining claims, the Court finds that Marathon had
a shop right to use the baffle system. For counts 3, 4, and 6, the Court finds that these state
law claims are either resolved pursuant to the Court's shop right ruling or barred as untimely
under Wyo. Stat. Ann. § 1-3-105(a)(iv)(C).

Inventorship

The Court will next address the question of inventorship. Count 2 of Mr. Preston's
complaint alleges that he is the sole inventor of the device described in the and '385 patent.
Defendants have filed a motion for summary judgment in its favor, claiming that Mr. Smith
is properly named as a co-inventor because he contributed the idea of adding a surface baffle
to the system.

The Court presumes that the named inventors on an issued patent are the true and only

18

inventors. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Inventorship is a question of law, but this question is answered within the context of factual findings. *Id.* Consequently, "misjoinder or nonjoinder of inventors must be proven by facts supported by clear and convincing evidence." *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1301 (Fed. Cir. 2002). In order to successfully challenge the presumed inventorship articulated in a patent, the party asserting error is required to prove by clear and convincing evidence that the patent is incorrect. *Ethicon*, 135 F.3d at 1461. The party challenging the patent may not rely solely on the testimony of an inventor or co-inventor. *Id.* Instead, the party challenging inventorship must present evidence to corroborate this testimony. Id. "An evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993).[7] In order to qualify as a co-inventor, "each joint inventor must generally contribute to the conception of the invention." *Ethicon*, 135 F.3d at 1460. Co-inventors need not contribute equally to the invention. Indeed, it is enough to contribute to one claim of a patent. *Id.*

---

[7]Because this question is before the Court on summary judgment proceedings, the question is somewhat different: whether the party challenging the patent's listed inventor or inventors has presented evidence from which a reasonable fact-finder could find in his favor by clear and convincing evidence.

19

Defendants claim that Mr. Smith contributed to the '385 patent by conceiving of a surface baffle placed at or near the top of the well bore. They largely rely on Mr. Smith's deposition testimony to that effect and the existence of US Patent number 4,402,916, issued in 1983. This patent describes an "[a]pparatus, and method, for diluting polymer solutions of a known concentration to a preselected concentration without any concomitant degradation or thinning of the polymer comprising the solution." Defs. App'x to '385 Patent Ex. G. That patent does not list Mr. Smith as an inventor. Mr. Smith testified that he worked directly with this device and got the idea to put a screen into the annulus of gas wells that was similar to the screens used in the '916 device. He testified in his deposition that around August or September of 2002, he thought of putting a device at the top of the well to prevent water from entering the flow lines. Smith Dep. 39. Specifically, he testified that he thought of a perforated steel baffle plate located within 60 feet of the surface, but Mr. Preston suggested that the plate be made from Lexan instead.[8] *Id.* at 42-43.

Mr. Preston points to the deposition testimony of other Marathon employees, who state that, to their knowledge, Mr. Preston was the sole inventor of the baffle system. *See* Plaintiff's Resp., Docket No. 86, at 20. Although Defendants contend that these witnesses are not credible because they only knew what Mr. Preston told them, the Court finds that the

[8]Lexan is the name of a brand of polycarbonate resin thermoplasitic.

testimony permits a reasonable inference that Mr. Preston was the sole inventor. Mr. Preston

also points out that Mr. Smith was required to maintain a log of his inventions for Marathon,

and it does not contain the baffle system. Lastly, he points to an email message sent on

February 3, 2003 from Mr. Smith to M. L. Murphey, who appears to be a Marathon

employee. Dep. Ex. 86. That message states:

> . . . A colleague of mine in our Powder River Basin field has
> designed and installed a prototype downhole gas separator baffle
> assembly that appears to be patentable and could be a significant
> new technology breakthrough in the Powder River Basin for
> coalbed Natural gas production. We feel that we are ready to
> submit the process and downhole equipment design for patent
> and need to begin that process. Are you the person in Marathon
> who needs to coordinate this? If not please advise me who I
> need to discusss [sic] this with. If so, please let me know where
> to find the forms and anything else that is required to start the
> process. . . .

*Id.* It is a reasonable inference from Mr. Smith's characterization that a colleague "designed

and installed a prototype," without any comment on Mr. Smith's role, that the colleague (i.e.,

Mr. Preston) was the sole inventor of the baffle assembly. *Id.*

Taken together, the Court finds that the evidence is conflicting on the question of Mr.

Smith's and Mr. Preston's relative roles regarding the invention described in the '385 patent.

Accordingly, there is a genuine issue of material fact, and summary judgment is

inappropriate.

21

In addition to this dispute regarding the '835 patent, Mr. Smith has asserted a counterclaim for declaratory judgment, asserting that he is a co-inventor of the '764 patent, and was improperly omitted. Mr. Preston moved for summary judgment in his favor, claiming that Defendants have failed to produce adequate evidence from which a reasonable jury could find that Mr. Smith co-invented the '764 device.

In response, Defendants rely on three items of evidence. The first is the previously discussed '916 patent. Second is Mr. Smith's uncorroborated deposition testimony, and third is the undisputed fact that Mr. Smith performed engineering calculations to determine the size of the apertures for the baffle plates. Smith Dep. 130-33; Preston Dep. II 191-94. Although neither party has submitted them, the drawings made by Mr. Preston using Marathon's CAD software apparently contain handwritten calculations of aperture surface area to ensure that the baffles did not unduly restrict gas flow in the well.

The '916 patent is not particularly probative of Mr. Smith's contribution to the '764 patent. It relies on Mr. Smith's unsupported testimony that he worked with the device shown and that doing so gave him the idea of using a surface baffle. The only independent corroboration of Mr. Smith's testimony is the handwritten calculation appearing on the CAD drawings of the baffle plates. These calculations corroborate only a small portion of Mr. Smith's deposition testimony, specifically, that he did in fact determine surface area

22

calculations.

Importantly, there is no independent evidence that these calculations contributed in any way to the '764 patent. None of the claims in the patent relate to apertures that are sized in a particular way. The only claims that arguably refer to aperture size are 23-25 (excluding 32 and 33, which refer to the size of the center aperture by which the baffle is secured). In each of those claims, the reference to aperture size is oblique, at best. For example, claim 23 states: "The apparatus of claim 1 [a three-plate baffle system], wherein the baffle imposes a tortuous path on fluids passing therethrough." One may infer that the "tortuous path" may in some part be imposed as a function of aperture size, but there are certainly no specifics in the patent. Neither does the description of preferred embodiments make any more than a passing reference to the size of the apertures, for example, in discussing when a baffle may act as a screen. Defendants failed to present evidence that puts inventorship of the '764 patent at issue. Accordingly, Mr. Preston's motion for summary judgment in his favor on Mr. Smith's counterclaim for declaratory judgment must be granted.

## Validity of '764 Patent

Mr. Preston moved for summary judgment on Defendants' affirmative defense that the '764 patent is invalid. Defendants generally argue invalidity on two grounds: 1) that the '764 patent fails to include all inventors, and 2) that Mr. Preston failed to comply with 35

23

U.S.C. § 112 by failing to disclose the CH4 resonating manifold as the best mode of carrying out the invention. The first basis is resolved in the Court's treatment of Mr. Preston's summary judgment motion regarding Mr. Smith's counterclaim of co-inventorship. The Court finds that it is not necessary to address the parties' "best mode" arguments. Defendants' affirmative defense that the '764 patent is invalid is a defense only to Mr. Preston's claim of patent infringement. Patent infringement, however, is no longer at issue given the Court's ruling that Marathon had a shop right to use the baffle system.

## Count 5: Implied Contract and Violation of Duty of Good Faith and Fair Dealing

Defendants contend that summary judgment in their favor is appropriate for count 5, in which Mr. Preston asserts breach of an implied contract and of the duty of good faith and fair dealing. In their initial briefing, they contended that this count was displaced by the Wyoming Uniform Trade Secret Act (UTSA) because the count alleged, in part, that Defendants improperly disclosed confidential information. Mr. Preston correctly points out that the UTSA does not apply to trade secret misappropriations occurring prior to July 1, 2006, and that all acts complained of occurred or began prior to this date. Wyo. Stat. Ann. § 40-24-110. In response, Defendants claim that this proceeding is nevertheless time barred.

Defendants' claim that count 5 is time barred is incorrect. As pled in the complaint, Mr. Preston alleges that an implied contract was formed. Complaint, ¶¶ 129, 135. He alleges

24

that Marathon promised 1) that he would receive compensation as a result of the use of his baffle system, and 2) Marathon would keep the baffle system confidential. Wyo. Stat. Ann. § 1-3-105(a)(ii)(A) provides an eight-year limitations period for an action "[u]pon a contract not in writing, either express or implied." This suit was commenced on November 10, 2008. All the events forming the basis of count 5 occurred after November 10, 2000, and this count is therefore not barred as untimely.

Defendants present no other basis for granting summary judgment in their favor on count 5, and their motion is therefore denied.

Employment Contract

The final issue the Court must address concerns the putative employment contract signed by Mr. Preston. He has filed a motion seeking summary judgment in his favor on this issue. Specifically, he contends that the agreement is not a valid contract due to lack of consideration, and that he is entitled to judgment as a matter of law on Marathon's counterclaim 1 and several of its affirmative defenses. The Court finds that summary judgment is inappropriate.

As an initial matter, the Court notes that the agreement at issue specifies in paragraph 9(b) that it "shall be governed and construed in accordance with Ohio law." Dep. Ex. 2. It is not entirely clear whether Wyoming courts would uphold this provision in light of the

25

apparent lack of a substantial relationship of any party to the State of Ohio. *See Resource Tech. Corp. v. Fisher Sci. Co.*, 924 P.2d 972, 975 (Wyo. 1996) (applying the *Restatement (Second) of Conflict of Laws* § 187 (Supp. 1989), which requires a substantial connection between the jurisdiction of chosen law and the parties). In any case, the Court need not resolve the question of whether Ohio law is applicable because the answer is the same in either Ohio or Wyoming.

In Ohio, the answer is clear: continued employment is sufficient consideration to modify an at-will employment contract.[9] *Lake Land Emp. Group of Akron, LLC v. Columber*, 804 N.E.2d 27, 32 (Ohio 2004) (". . . [C]onsideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause."). The Ohio Supreme Court's rule to that effect is based on the premise that an at-will relationship may be terminated at any time. Consequently, either party—the employer or employee—may propose a change to the terms at any time. The solution for the other party who does not accept the terms is to terminate the employment relationship and be free of all unaccepted obligations. *Id.*

---

[9]It is apparently uncontested, at least for the purpose of summary judgment proceedings, that Mr. Preston was an at-will employee.

26

The Wyoming Supreme Court has not squarely addressed this issue, but this Court concludes that it would employ a similar reasoning under the facts at bar. The Wyoming Supreme Court has characterized an at-will employment contract as "a unilateral contract, meaning that the offeror's promise is accepted by performance, and does not involve mutuality of obligation between the parties." *Brodie v. General Chem. Corp.*, 934 P.2d 1263, 1265 (Wyo. 1997). *Accord, e.g.*, *Ormsby v. Dana Kepner Co. of Wyo., Inc.*, 997 P.2d 465, 471 (Wyo. 2000). An employee supplies consideration for this contract when he or she performs duties as an employee. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 217 (Wyo. 1994). In effect, the employer's obligation to pay the employee (and offer benefits, or any other promise under the unilateral contract) is imposed only upon the employee's performance consistent with the terms of the contract.

As a result, either the employee or the employer may reopen negotiations at any time. An employee, after working for $9.00 per hour on Monday, may approach the employer on Tuesday and attempt to renegotiate the wage to $10.00 per hour. The employer may accept the revised terms, in effect forming a new unilateral contract. Alternatively, the employer may reject the terms and either maintain the prior unilateral offer or revoke it. If it rejects the proposed change in terms, the employee is free to walk away without penalty.

That is, in effect, what happened in Mr. Preston's case, except that it is the employer

27

who proposed a change in terms, and Mr. Preston accepted by continuing to work for Marathon. Mr. Preston contends that he signed a Pennaco employment agreement around the end of February 2001 and began working around February 28 or March 1 of that year. On April 5, 2001, Marathon presented the employee agreement and told him that he must sign it or his employment would be terminated. The agreement generally obligates Mr. Preston to assign to Marathon his interest in any invention conceived during his period of Marathon employment. Mr. Preston, presumably wishing to maintain his employment, signed the agreement, but wrote down in the space reserved for stating prior inventions: "CH4 resonating manifold." Dep. Ex. 2.

The Court finds that the agreement is simply another term of the unilateral contract, and governs the at-will employment relationship from that point forward. In addition, the Court notes that Marathon could have accomplished the same result by terminating Mr. Preston and immediately offerring to re-hire him on the condition that he consented to the agreement in addition to the previous terms of his employment. Rather than require an at-will employer to engage in this ritual, the Court rules that the agreement is simply another term of an at-will, unilateral employment contract, and Mr. Preston was given consideration in the form of pay and benefits received from Marathon from that day forward.

Mr. Preston, of course, contends that this analysis is incorrect. In particular, he points

28

to several Wyoming cases holding that additional consideration is required in order to convert a for-cause employment relationship into one at-will. *E.g.*, *Brodie*, 934 P.2d 1263. He then claims that they stand for the broader proposition that an employer may not unilaterally alter the terms of employment in any way without supplying additional consideration. In doing so, however, Mr. Preston has missed a key distinction between those cases and this one. In a situation of for-cause employment, that is, where the employment relationship may only be terminated for cause, the contract is bilateral. The parties have made mutual promises of future performance. The contract is complete, and it is black-letter law that modification of a contract requires consideration. *E.g.*, *Harvard v. Anderson*, 524 P.2d 880, 883 (Wyo. 1974); *Brodie*, 934 P.2d at 1268-69. The cases Mr. Preston cites that require consideration in order to convert a for-cause employment relationship into one at will are fully consistent with this principle, but cannot be more broadly applied to the facts of the current case. Accordingly, the Court rules that the employee agreement illustrated in Deposition Exhibit 2 is not void for lack of consideration. Mr. Preston is not entitled to summary judgment as a matter of law on Defendants' contract claims.

Conclusion

Pursuant to the foregoing discussion, the Court rules as follows:

IT IS ORDERED that *Defendants' Motion for Partial Summary Judgment on the Shop*

*Right Doctrine*, Docket No. 32, is GRANTED.

IT IS FURTHER ORDERED that *Defendants' Motion for Partial Summary Judgment on Preempted and Trade Secret Claims*, Docket No. 51, is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that *Plaintiff's Motion for Partial Summary Judgment on Defendants' Counterclaims and Affirmative Defense Nos. 6, 7, 8, 9, 10, and 11*, Docket No. 57, is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that *Defendants' Motion for Summary Judgment Regarding Joint Inventorship and Ownership of '385 Patent*, Docket No. 61, is DENIED.

IT IS FINALLY ORDERED that *Defendants' Motion for Summary Judgment Regarding Non-Infringement of '764 Patent*, Docket No. 65, is DENIED AS MOOT in light of the Court's grant of summary judgment on the shop right doctrine.

Dated this ___28th___ day of December, 2009.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE