FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 1 0 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

YALE PRESTON,

    Plaintiff,

vs.

Case No. 08-CV-239-J

MARATHON OIL COMPANY and
THOMAS A. SMITH,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is a dispute arising from claims of inventorship and ownership of two

patents. Following entry of this Court's *Order on Motions for Summary Judgment* on

December 28, 2009, the remaining issues involve inventorship of one patent and ownership

of both patents at issue.[1]

Specifically, Mr. Preston made multiple claims in his complaint: patent infringement,

declaratory judgment that he is the sole inventor of both patents, unjust enrichment and

---

[1]The Court's order also left intact Mr. Preston's claim for implied contract, but he
has not pursued that claim.

injunctive relief, conversion, breach of an implied contract and the duty of good faith and fair dealing, and misappropriation of trade secrets. Defendants denied liability and counterclaimed for declaratory relief. Specifically, Marathon seeks a declaration that Mr. Preston is required by contract to assign his interest in the patents at issue, and Mr. Smith sought a declaration that he was a co-inventor of patent number 6,959,764 ('764) .

The Court disposed of most claims on summary judgment. It found that Mr. Smith was not a co-inventor on the '764 patent, and that most of Mr. Preston's state law claims (i.e., conversion, misappropriation of trade secrets) were barred as untimely. The issues remaining for trial were: 1) inventorship of patent number 7,207,385 ('385), 2) ownership of both the '764 and '385 patents, and 3) Mr. Preston's claim of breach of an implied contract. The remaining issues came before the Court during a protracted trial to the bench on January 20-22, February 11-12, and March 9-10, 2010.

For the reasons set forth in detail below, the Court finds that Mr. Preston was indeed the sole inventor of the '385 patent, but that the inventions described in the '764 and '385 patents were invented during his employment by Marathon. It is not entirely clear whether Mr. Preston has abandoned his claim of an implied contract, but in any case, the Court finds that no implied contract was formed.

2

### *FINDINGS OF FACT*

1.    On February 22, 2001, Marathon, through the wholly-owned subsidiary

Pennaco Energy, offered Mr. Preston the position of "Pumper II." 1 Tr. 82; Ex.

3. Mr. Preston accepted employment on February 27, 2001. 1 Tr. 86; Ex. 3.

2.    Mr. Preston began working for Marathon on March 30, 2001. Although Mr.

Preston believes he began on March 1, the Court does not find his testimony

credible on this point. Exhibit QQ is an IRS Form W-4 that Mr. Preston filled

out, and it was dated April 5, 2001. This is the same day that Mr. Preston

signed and dated a document titled, "Marathon Oil Company and Subsidiaries

Employee Agreement." Ex. 2. The fact that the dates are the same is consistent

with the common practice of giving a new employee the initial necessary

employment paperwork and asking him to fill it out all at once. Moreover, Ex.

OO was a document entitled, "Post Employment Data Form." It indicates that

Mr. Preston was a "New," "Regular" employee, with an employment date of

March 30, 2001. It is signed by a human resources representative and dated

April 2, 2001.

3.    Moreover, Mr. Preston's explanation—that he changed address and had to fill

out a new form—is unconvincing. The Court is not aware of any IRS rule or

3

common practice that requires a new W-4 form when an employee changes
address. Mr. Preston also attempted to show that his employment benefits
began 30 days after his employment began, on March 30. Ex. 170. The job
offer letter states that Mr. Preston "can expect medical coverage to be in place
within 30 days." Ex. 3. Exhibit 170 is a benefits form that show his benefit
coverage is effective as of March 30, 2001. Neither of these exhibits
demonstrates that Mr. Preston began work on March 1 rather than March 30.
Indeed, it suggests that Marathon offered benefits effective the day of hire,
even if the coverage was not immediately in place.

4.      Turning to the employee agreement, Paragraph four of that document states:

> Previous Inventions and Writings.  Below is a list and brief
> description of all of EMPLOYEE's unpatented inventions and
> unpublished writings.    MARATHON agrees that such
> inventions and writings are NOT Intellectual Property [defined
> earlier in the document] and are NOT the property of
> MARATHON hereunder.  If no listing is made, EMPLOYEE
> has no such inventions or properties.

Beneath this paragraph is handwritten the following: "CH4 resonating
manifold." Ex. 2.

5.      Marathon did not investigate or inquire further explanation about the CH4

4

resonating manifold, 1 Tr. 94, and no description of the manifold was disclosed.

6.    Mr. Preston worked as a "Pumper II" until the summer of 2001, when he was promoted to "Pumper." *Id.* at 95.

7.    Mr. Preston worked as a "Pumper" until approximately August 2002, when he was promoted to "SCADA Operator." *Id.* at 98. He held this position until his employment terminated, April of 2003. VI Tr. 838.

8.    In general, coal bed methane wells include a tubular well casing that extends hundreds of feet into the ground, but these wells are relatively shallow compared with conventionally flowing gas wells. Coal bed methane gas is produced from water-saturated coal. Coal bed methane wells include an inner production tubing that runs through the center of the well casing from the surface to the coal formation. Unlike a conventionally flowing well, gas in a coal bed methane well is not produced up the inner production tubing. Instead, a submersible pump is connected to the lower end of the tubing, which is positioned within water produced into a well penetrating the coal formation and is used to pump produced water from the coal formation to the surface, through the inner production tubing. This relieves pressure in the formation

5

and allows methane gas to be produced through the "annulus" of the well. The annulus is the space between the well casing and the inner production tubing. IV Tr. 598-600, 605, 610, 642, 662, 692, 695-696.

9.    Once the methane gas reaches the surface, it is collected by gathering lines that are situated on or near the surface. *Id.* at 599, 603, 610-612, 693-695; Ex. QQQ. The gathering lines run generally horizontally and sometimes bring gas from multiple wells together at a "manifold." The combined gas is then pumped through transmission lines to downstream market pipelines.

10.   One problem with some coal bed methane and other gas wells is the presence of water in the gathering lines. IV Tr. 599, 603, 610-612, 659, 687-688, 691-695. Coal bed methane tends to contain a high degree of moisture. Also, water can flow violently up the annulus of the well toward the surface, along with the gas that is produced. Once in the surface gathering lines, the water tends to accumulate in low spots. The depth of surface lines necessarily varies with the terrain. For example, the problem with water can be particularly pronounced when the surface lines must pass under a stream bed because the resulting low spot in the lines gathers sufficient water to block the passage of gas, acting much like a P-trap in a kitchen sink. *Id.* at 603-612; Ex. RRR.

6

11.   In approximately August of 2002, Mr. Preston first raised the idea of using baffles to reduce water in a methane well annulus. He brought the idea to a Marathon employee named Jeb Beacham. 1 Tr. 100; III Tr. 441.

12.   At that time, Mr. Preston showed a drawing of a baffle plate to Mr. Beacham and discussed with Mr. Beacham how baffles might solve the gas locking and water surge problems in a methane well annulus. *Id.* at 103 and 109; III Tr. 436, 440, and 444. Mr. Beacham described the initial drawings as "conceptual" in nature, like "somebody's idea put on a piece of paper." III Tr. 437.

13.   Mr. Preston showed Mr. Beacham one drawing at the initial meeting, and other drawings in later meetings. 1 Tr. 103; III Tr. 444.

14.   Prior to this meeting, Mr. Beacham had never seen a baffle used in the manner Mr. Preston suggested. III Tr. 440.

15.   Mr. Beacham suggested that Mr. Preston share the idea with Chuck Cornelius, Mr. Preston's supervisor. *Id.* at 442. Taking Beacham's advice, he showed Mr. Cornelius a drawing of a perforated baffle. *Id.* at 409, 413.

16.   Prior to this meeting, Mr. Cornelius had never seen a baffle used in the manner Mr. Preston suggested. III Tr. 421.

17.   Mr. Cornelius suggested sharing the idea with Thomas Smith, a Marathon

7

Engineer at Marathon's Denver office. 1 Tr. 125; III Tr. 411, 413.

18.     Before Mr. Preston met Mr. Smith, he shared the baffle idea with Lee Sigman,
        another Marathon employee. He eventually asked Mr. Sigman if the baffles
        could be tested in a well. IV Tr. 484, 486, 487, 521, 522.

19.     In anticipation of being introduced to Mr. Smith, over the 2002 Thanksgiving
        holiday, Mr. Preston created two-dimensional drawings of baffle plates using
        a computer aided drafting program. I Tr. 115, 116, 120, 121, 123; Exs. 82-85.

20.     Mr. Cornelius introduced Mr. Smith and Mr. Preston. III Tr. 428, 429. Mr.
        Preston showed Mr. Smith the drawings of the baffle plates.

21.     The Court finds that this introduction was the first meeting on this subject
        between Mr. Preston and Mr. Smith, and that this was the first time Mr. Smith
        had considered using baffle plates in this way. Mr. Smith's version of the
        baffle plate development is quite different than the facts set out above.
        Generally speaking, he testified that he and Mr. Preston collaborated from the
        beginning on a system involving baffle plates. The Court does not find this
        testimony to be credible, and it is contrary to the testimony of other Marathon
        employees and former employees.

22.     In addition, the Court does not find that the baffle system was "invented," that

8

is, both conceived and reduced to a practice (discussed further *infra*), until well into Mr. Preston's employment. Mr. Preston testified that he had the idea for a CH4 resonating manifold, and that he produced a detailed drawing of it prior to his employment with Marathon. I Tr. 49. Mr. Preston, however, was not able to produce that drawing. In addition, the drawings he made and brought to his Marathon co-workers were quite crude compared to the CH4 resonating manifold drawing he produced years later during the course of litigation. Although it is possible Mr. Preston had an idea for an invention before his employment with Marathon, there is no evidence other than his own testimony. In any event, the Court finds that it was not reduced to practice until, at the very earliest, approximately late summer or early autumn 2002, well after his employment commenced with Marathon.

23.    Mr. Preston gave Mr. Smith the drawings at their meeting. Mr. Smith used them to make calculations to determine the proper size of the perforations in order to ensure adequate gas flow through one or more plates. I Tr. 115-25; II Tr. 269-72.

24.    Mr. Preston hired, on Marathon's behalf, a company called Advanced Cutting Technologies to make 40 baffle plates from Lexan, which is a brand of

9

polycarbonate resin thermoplastic. Ex. 21, I Tr. 150; IV Tr. 492-93; V Tr. 727-30.

25.    The parties agree that the first baffle plate or plates were installed in a well on January 31, 2003. There is some dispute about whether that well contained one plate near the surface of the well or one plate near the surface and an array of three more further down the well. Defendants contend on page 11 of their proposed findings of fact and conclusions of law that the first well contained only a surface baffle. Both Mr. Smith and Mr. Preston, however, indicated that the first well had more than the surface baffle installed. IV Tr. 719; I Tr. 136. Moreover, in an email dated February 3, 2003, Mr. Preston makes reference to two relevant measurements: a "Top Baffle" and a "Bottom of the bottom baffle set." Ex. 86. This reference to a "bottom baffle set" suggests to the Court that there was a "set" of baffle plates that are located near the bottom. The Court, therefore, finds that this well included four baffle plates.

26.    Exhibit 86 is an email exchange that shows on February 3, 2003, Mr. Smith sent an email to a colleague named Ree C. The substantive text of that email is as follows:

Ree C - A collegue [sic] of mine in our Powder River Basin

10

> field office has designed and installed a prototype downhole gas
> separator baffle assembly that appears to be patentable and
> could be a significant new technology breakthrough in the
> Powder River Basin for coalbed [n]atural gas production. We
> feel that we are ready to submit the process and downhole
> equipment design for patent and need to begin that process. Are
> you the person in Marathon who needs to coordinate this? If not,
> please advise me who I need to discuss this with. If so, please let
> me know where to find the forms and anything else that is
> required to start this process.

27.    Mr. Preston's response, in addition to the measurements mentioned above, was

the following: "This is really cool! Thanks for all of your support on this

project." Ex. 86.

28.    In early 2003, after the baffle systems had begun to be installed in Marathon's

wells, Smith initiated Marathon's internal patenting process. IV Tr. 587-88;

591-95, 608-10, V Tr. 718-19, 747-60; Ex. 86. Preston was fully aware that

Smith was seeking to have Marathon patent the baffle system installed in

Marathon's wells, as evidenced by the email quoted above. Ex. 86; II Tr.

280-83, VI Tr. 835-36; V Tr. 743-60. Preston knew that Smith's and his

invention was going through Marathon's patenting process, which included an

invention disclosure form, and at no time did Preston object to Smith being a

co-inventor during Marathon's patenting process. II Tr. 280-283; V Tr.

11

747-760. As part of Marathon's patenting process, Smith presented to Preston a Marathon disclosure form which listed both Smith and Preston as inventors. V Tr. 748-753. Preston never objected that Smith was listed as a co-inventor and never claimed to be the sole inventor. *Id.* at 752.

29.     Mr. Preston and Marathon each filed separate United States patent applications with the United States Patent and Trademark Office ("USPTO"), which issued, respectively, as the '764 patent and the '385 patent. Exs. 7, 6, respectively. Both of the patents-in-suit describe and claim aspects of a downhole baffle system for use in gas wells, similar to the systems that were installed downhole in Marathon's wells in the Powder River Basin in 2003.

30.     The '764 patent issued November 1, 2005, from U.S. patent application no. 10/455,562, filed June 5, 2003. Ex. 7. The '764 patent application was filed by Mr. Preston after he left Marathon, through his patent counsel, Pate, Pierce, & Baird, P.C. of Salt Lake City.

31.     Mr. Preston is the sole inventor named in the '764 patent. Ex. 7.

32.     The '385 patent issued April 24, 2007, from U.S. patent application no. 10/867,528, filed June 14, 2004. Ex. 6. The '385 patent application was prepared, filed, and prosecuted by Marathon, through its patent counsel, Jack

Ebel and Steve Gratton.

33.     Messrs. Smith and Preston are named as co-inventors of the '385 patent. *Id.*

34.     Pursuant to his employment agreement, Mr. Smith assigned his rights in the
        '385 patent to Marathon. *See* V Tr. 752-53, 757; Ex. 6.

35.     In connection with the filing and prosecution of the '385 patent application,
        Marathon's patent counsel, Jack Ebel as well as Steve Gratton, on separate
        occasions each attempted to contact Mr. Preston both in writing and by
        telephone. Ex. 15; Ex. H; II Tr. 207-210. Mr. Gratton sent Mr. Preston a copy
        of the '385 patent application for his review. Exs. 14, 16. In response through
        correspondence and during a telephone conversation with Mr. Ebel, Mr.
        Preston made clear that he would not voluntarily assist Marathon with the
        filing and prosecution of the '385 patent application and would not sign a
        separate assignment of his interest in the '385 patent application. Ex. 16; II Tr.
        207-210.

36.     During the prosecution of the '385 patent application, the USPTO initially
        issued a "non-statutory, obviousness-type double patenting" rejection based on
        the '764 patent. Ex. 100.

37.     In response to the double patenting rejection initially made by the USPTO in

13

the prosecution of the '385 patent application, Marathon requested that the requirement to file a terminal disclaimer be stayed until the claims were allowable. Ex. 101. Ultimately, the USPTO withdrew the double patenting rejection. Ex. 102; Ex. 6.

38.    Marathon eventually installed a baffle system in 11 wells in the Powder River Basin. IV Tr. 510-14; Ex. GG. All the baffles were eventually removed when Marathon concluded that they were not working as effectively as was hoped. IV Tr. 512-14; Eg. GG.

## *CONCLUSIONS OF LAW*

Inventorship

1.    An "inventor" of a patentable invention is one who conceives the device. *E.g.*, *Board of Educ. ex rel. Board of Trustees of Fla. St. U. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1337-38 (Fed. Cir. 2003).

2.    Conception is the formation of a definite, permanent idea of the complete and operable invention as it will be applied in practice. *Id.* at 1338.

3.    The test for whether something is definite is whether it can be reduced to practice by someone with ordinary skill in the art, and no extensive research or experimentation is required. *Id.*

14

4.   A person who advises the inventor without having a firm and permanent idea of the claimed contribution does not qualify as a joint inventor. *Id.*

5.   The USPTO named both Mr. Smith and Mr. Preston as the inventors of the '385 patent. There is a strong presumption that the inventors named on an issued patent are the true and only inventors. *E.g.*, *Ethicon v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). This presumption may be overcome with clear and convincing proof that a person is improperly named as a co-inventor. *See id.* at 1461.

6.   To meet the burden of clear and convincing proof, a party claiming misjoinder must provide substantial, corroborating evidence. This evidence necessarily includes more than the testimony of the party claiming misjoinder. *E.g.*, *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993).

7.   Mr. Preston is the sole inventor of the '385 patent. Mr. Preston's testimony, with the corroborating testimony of other Marathon employees and contemporaneous email communications constitute clear and convincing evidence of misjoinder. Defendants strongly argue that Mr. Preston did not have the experience in the oil and gas industry, particularly in downhole systems, to develop the baffle system as eventually constructed and installed.

The Court's finding of inventorship, however, does not preclude the possibility that others gave advice and general principles necessary for Mr. Preston, despite his inexperience, to develop a relatively crude idea into a working prototype. Moreover, Marathon has from the beginning of this litigation claimed that the baffle system did not function well. *See, e.g., Prop. Findings of Fact and Conclusions of Law*, Doc. 142, at 11. That claim is perfectly consistent with a device invented by someone with little experience in the field.

Ownership

1.   In Wyoming, the necessary elements of a contract are offer, acceptance, and consideration. *Finch v. Farmers Co-op Oil Co.*, 109 P.3d 537, 541 (Wyo. 2005).

2.   An at-will employment contract is a unilateral contract, which means it is accepted by performance. Accordingly, it may be modified at any time by any party.   *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 217 (Wyo. 1994). Additional consideration is not required. *Order on Motions for Summary Judgment*, Doc. No. 97 at 25-29.

3.   Marathon offered employment to Mr. Preston on February 22, 2001. He

16

accepted employment on February 27 2001. Mr. Preston promised to perform work for Marathon, and in exchange received hourly pay and benefits. A valid, unilateral employment contract was formed.

4.   The employee agreement signed by Mr. Preston, Ex. 2, is a valid condition of his unilateral employment contract with Marathon, and is binding.[2]

5.   The employee agreement requires Mr. Preston to assign Marathon all intellectual property, as that term is defined in the agreement. Ex. 2.

6.   The agreement defines intellectual property as "all inventions . . . made or conceived by [Mr. Preston] during the term of employment with MARATHON which (1) relate to the present or reasonably anticipated business of the MARATHON GROUP." Ex. 2.

7.   A thing is "invented" when it is both conceived and reduced to practice. *See*,

---

[2]Defendants repeatedly asserted in argument and in their proposed findings of fact and conclusions of law that this Court found the agreement to be valid and enforceable in its summary judgment order. A careful review of that order confirms that it found no such thing. First, it merely denied summary judgment in Mr. Preston's favor. By definition, this is not the same as summary judgment in Defendants' favor, *i.e.*, a ruling that the contract is valid. The decision merely stands for the proposition that a genuine issue of material fact exists. Second, the Court's decision was limited to the far narrower question of whether the contract was never formed as a matter of law for lack of consideration. *Summary Judgment Order* at 29. The Court made no comment on any other element of a valid contract.

17

*e.g.*, 35 U.S.C. 102(g)(2).

8.   The Court already found that Mr. Preston's testimony regarding the level of
development of the CH4 resonating manifold is not credible, and that he had,
at most, little more than a vague idea before his employment with Marathon
began. The Court concludes, as a matter of law, that Mr. Preston did not
"invent" the CH4 resonating manifold, or any component thereof, until after
his employment with Marathon began. The CH4 resonating manifold was not
excluded from the employee agreement.

9.   Mr. Preston "invented" the baffle system during his employment with
Marathon.

10.  Mr. Preston is required by the employee agreement to assign all interest in the
'764 and '385 patents to Marathon.

11.  Mr. Preston has not assigned his interest in those patents, and has therefore
breached his employment agreement.

Implied Contract

1.   Contracts may be either express or implied. *Wilder v. Cody Country Chamber
of Commerce*, 868 P.2d 211, 216 -217 (Wyo. 1994). "Implied contracts arise
from a mutual agreement and intent to promise which is found in the acts or

18

conduct of the party sought to be bound." *Id.* citing *Restatement (Second) of Contracts* §§ 18-19 (1981) (stating rules that assent to the formation of informal contracts must be manifested by words, acts or conduct).

2.     An implied-in-fact contract is dependent upon the parties' intent. *Birt v. Wells Fargo Home Mortgage Inc.*, 75 P.3d 640, 649-650 (Wyo. 2003). For an implied-in-fact contract to have been created by the parties' conduct, the conduct from which that inference is drawn must be sufficient to support the conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement. *Id.* In determining whether an implied-in-fact contract was formed, subjective intent of the parties is not considered, rather the outward manifestations of a party's assent controls. *Id.*

3.     Here, there is no evidence from which this Court can find that an implied contract was created between Mr. Preston and Marathon. All of the evidence points to the opposite conclusion; neither Mr. Preston nor Marathon had any intention of entering into an additional contract.

4.     Preston's ambiguous reference in his Complaint to "significantly compensate" is not sufficient to create an implied contract. It is a well-established rule that a valid contract must be sufficiently definite to lead to a clear conclusion as to

19

the full duties required to constitute compliance, or to permit accurate measurement of damages for its breach. *Action Ads, Inc. v. Judes*, 671 P.2d 309, 311 (Wyo. 1983) (quoting *Forster-Davis Motor Co. v. Slaterbeck*, 98 P.2d 17 (Okla. 1979)). There is no legally sufficient evidentiary basis to conclude that Marathon demonstrated any intent to be bound by any terms of any implied contract.

Dated this _10_ day of August, 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

20